IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CORY PAIGE,<br><br>        **Plaintiff,**<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INC., KIMBERLY BUTLER, and JOHN TROST,<br><br>        **Defendants.** | Case No. 3:16-CV-01315-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on Defendants Kimberly Butler, Dr. John Trost and Wexford Health Sources, Inc.'s Motions for Summary Judgment. (Docs. 132 & 135). For the reasons set forth below, Defendants' Motions for Summary Judgment are granted.

## FACTS

Plaintiff Corey Paige, an inmate previously incarcerated at Menard Correctional Center ("Menard"), filed this action pursuant to 42 U.S.C. § 1983 on July 28, 2016. (Doc. 6). Paige alleges that Defendant Dr. Trost violated the Eighth Amendment to the U.S. Constitution when he acted with deliberate indifference by prescribing Excedrin for Paige's headaches and vision loss which continued to grow worse from 2012 through 2015. Paige also alleges that Defendant Butler violated the Eighth Amendment when she acted with deliberate indifference to his medical needs by failing to object or intervene during the alleged ineffective medical treatment. Finally, Paige brings a *Monell* liability claim against Wexford. (Doc. 98).

On August 30, 2012, Paige was seen at a nurse sick call visit because of recent migraines. (Doc. 134, p. 22). Paige had a throbbing pain, blurry vision, diplopia, and dizziness. Paige was referred to a medical doctor. On September 4, 2012, and October 11, 2012, Paige was seen by Dr. Shepherd, and Dr. Shepherd's treatment plan called for Excedrin. (*Id*. at pp. 23-24).

On August 18, 2013, Paige was seen at a nurse sick call visit again complaining of migraines. (*Id*. at p. 27). Paige had a throbbing pain, blurry vision, diplopia, dizziness, and photophobia. Paige requested Excedrin due to his history of migraines and was referred to an eye doctor. (*Id*.).

On August 28, 2013, Paige was seen by an optometrist—Dr. Lochhead. (*Id*. at p. 129). Dr. Lochhead noted that Paige's complaints were blurry vision, headaches, and light sensitivity. (*Id*.). Paige's vision was 20/30 in the right eye and 20/800 in the left eye. (*Id*.). Paige's pupils were round, full, and equal with interocular pressures normal in both eyes. (*Id*.). Dr. Lochhead prescribed Paige with corrective lenses and requested a three-month follow-up. (*Id*.).

On February 11, 2014, Paige was seen at a nurse sick call with a migraine. (*Id*. at p. 29). Paige had a throbbing and stabbing pain, and photophobia. He reported that in similar episodes, Excedrin was effective. Paige was again referred to a physician.

On May 21, 2014, Paige was examined by Dr. Lochhead. Unfortunately, Paige's visual acuity had worsened, his intraocular pressure had increased, and Dr. Lochhead suspected that Paige had glaucoma. (*Id*. at pp. 132-34). Accordingly, Dr. Lochhead started treating Paige with Xalatan Drops to regulate the intraocular pressure. (*Id*.).

On June 4, 2014, Paige had a follow-up with Dr. Lochhead. Paige was not taking the Xalatan drops, and his intraocular pressure had continued to increase in both eyes. (*Id.* at p. 135). Dr. Lochhead continued treating Paige with Xalatan drops. (*Id.*). Paige was to follow-up in two weeks (*Id.*).

On August 20, 2014, Paige again had a follow-up with Dr. Lochhead. (*Id.* at p. 136). Paige ran out of the Xalatan drops, and his intraocular pressure was still higher than their original readings in 2013. Dr. Lochhead still suspected glaucoma and continued treating Paige with Xalatan drops. (*Id.*).

Paige was seen by Dr. Lochhead on October 30, 2014. (*Id.* at p. 137). Dr. Lochhead noted that Paige's intraocular pressure had dropped to 12 mm/hg in the right eye and 13 mm/hg in the left. (*Id.*). On January 14, 2015, Dr. Lochhead noted that Paige's intraocular pressures were 15 mm/hg in both eyes. Paige's pupils were round, equal, and full, but Dr. Lochhead still suspected glaucoma and recommended continue use of Xalatan. (*Id.*).

On May 20, 2015, Paige was seen by Dr. P.H. Kehoe. (*Id.* at p. 139). Paige's chief complaint was glaucoma and declining vision. (*Id.*). Dr. Kehoe confirmed Paige's glaucoma, but also noted "bilateral temporal hemianopsia with severely reduced vision in the left eye." (*Id.*). He then recommended "neuro or neuro-ophthalmology ASAP." (*Id.*).

After May 21, 2015, there is no dispute as to whether Paige received adequate and appropriate medical care. (Doc. 143, p. 9). In June 2015, Paige underwent a tumor

Page 3 of 14

resection surgery. (Doc. 133-1, p. 15). Paige's vision stabilized after this surgery. (*Id.* at p. 17).

Unfortunately, Paige's tumor showed signs of progression and he underwent radiation treatments in 2016. (*Id.*). After his first radiation treatment, Paige's "vision started to get worse[,]" but Paige's vision stabilized after his second radiation treatment in December 2016. (*Id.*).

### *Dr. Trost*

Dr. Trost became medical director at Menard in November 2013. (Doc. 133-2, p. 3). Dr. Trost does not recall treating or evaluating Paige at any time prior to May 2015. (*Id.* at p. 4). However, Paige recalled being seen by Dr. Trost "a few times during that time between 2012 and 2015." (Doc. 133-1, p. 19). He recalled talking to Dr. Trost in 2014 and 2015. (*Id.*). Paige testified that Dr. Trost continued only providing him Excedrin and providing eye drops. (*Id.*). In 2015, Paige requested that Dr. Trost provide "different treatment because the treatment they were giving [him] wasn't working." (*Id.*).

### *Kimberly Butler*

Defendant Butler was Warden of Menard from approximately April 2014 until approximately 2016. (Doc. 136-2). Paige wrote Defendant Butler kites in 2015 about not receiving treatment recommended by an outside endocrinologist. (Doc. 144, p. 3; Doc 2-1, pp. 99-100). Paige's grievance—dated July 26, 2015—complained about the treatment he had been receiving since 2012 for migraines and vision problems. (Doc. 144, p. 5). In the grievance, Paige did not complain about Defendant Butler—and it was not marked as an emergency grievance. (*Id.*).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

DISCUSSION

I. **Count X – Failure to Intervene Against Defendant Butler[1]**

Paige alleges Butler failed to intervene and "direct the procurement of an MRI or other necessary medical treatment for Plaintiff." (Doc. 98, p. 6). Failure to intervene is a constitutional violation under the Eighth Amendment. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).

"In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation . . . ." *Harper*, 400 F.3d at 1064. As explained below, Paige failed to establish that Dr. Trost and Wexford were deliberately indifferent to his medical needs in violation of his Eighth Amendment. Thus, summary judgment must be granted in favor of Defendant Butler on Count X.

II. **Count XI – Deliberate Indifference to Serious Medical Need Against Defendant Dr. Trost**

The Eighth Amendment prohibits cruel and unusual punishments and deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must show: (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). A medical condition is

---

[1] Paige's counsel purports to number the Counts in the same manner as the Court's Order on January 12, 2017. However, Count XIII was dismissed with prejudice. Instead, the Court added the *Monell* claim as Count XV. (Doc. 6, p. 11).

objectively serious if " 'a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson.'" *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014)).

Paige brings an Eighth Amendment deliberate indifference claim against Dr. Trost for denying him adequate medical care by prescribing Excedrin for Paige's headaches and continuing with Dr. Lochhead's course of treatment. Dr. Trost does not contest that Paige suffered a serious medical condition, but instead argues he was not deliberately indifferent to Paige.

Here, the issue is whether Paige has shown that Dr. Trost had a subjective knowledge of—and then disregarded—an excessive risk to his health. Paige does not need to show Dr. Trost "literally ignored" his complaint, but that Dr. Trost was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry*, 604 F.3d at 440 (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is

> effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry*, 604 F.3d at 441.

"A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." *Estelle v. Gamble,* 429 U.S. 97, 107 (1976). Courts have granted summary judgment to medical professionals who decided not to order a specific test or course of treatment that a prisoner argues was necessary. *See Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008) (noting district court did not err in granting defendant's motion for summary judgment when defendant decided that "an MRI and a referral to an orthopedic surgeon were not appropriate"); *Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008) (affirming district court's grant of summary judgment, and noting that "[p]erhaps it would have been prudent for [doctor] to immediately order a cystoscopy[,] [b]ut the evidence adduced below does not indicate that he was deliberately indifferent in failing to do so"); *Johnson v. Doughty*, 433 F.3d 1001, 1014 (7th Cir. 2006) (finding that district court's decision of no deliberate indifference was not clearly erroneous when the "record shows [ ] that [doctor] factored [plaintiff's] pain

into his treatment decisions and, given his findings, he prescribed non-surgical remedies designed to alleviate [plaintiff's] pain").

At the same time, the Seventh Circuit has recognized that "a significant delay in effective medical treatment . . . may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Berry*, 604 F.3d at 441. But after construing the evidence in a light most favorable to Paige, Dr. Trost was not deliberately indifferent to Paige's medical needs. Even if Dr. Trost continued the same treatment during 2014 and 2015, the evidence shows that Excedrin was effective when he suffered migraines. (Doc. 134, p. 29). Besides Excedrin's effectiveness, when Paige started consistently taking Xalatan drops, his intraocular pressure dropped. (*Id*. at pp. 137-138). Paige's vision also remained stable from January 2015 to June 2015. (*Id*. at p. 68).

Paige has failed to show that Dr. Trost's decision to not order an MRI was so out of bounds that it could not have reflected medical judgment. His expert, Dr. Todd Leftkowitz, argues Paige's visual field tests from May 21, 2014, show that Paige was experiencing bitemporal hemianopsia which is suggestive of a pituitary area lesion. (Doc. 133-4, pp. 4-5). Dr. Leftkowitz opines the visual field tests results should have been referred to neurology or neurosurgery immediately. (*Id*.). The problem is there is no evidence that Dr. Trost should have reviewed the visual field tests to make this determination. When asked whether Dr. Leftkowitz understood Dr. Trost's involvement in Paige's treatment, Dr. Leftkowitz answered, "Dr. Trost? The name is not ringing a bell." (*Id*. at p. 7).

While the Seventh Circuit has "recognized that a departure from professional standards that is so inadequate that it demonstrated an absence of professional judgment could support deliberate indifference," *Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021) (citations omitted), Dr. Leftkowitz's opinion falls far short of raising such an inference. At best, Dr. Leftkowitz's opinion criticizes *Dr. Lochhead*:

> Q: Do you think it's reasonable for a general practice physician to rely on the recommendations or the readings of an eye specialist like an optometrist?
>
> Dr. Leftkowitz: Right. But, of course, you know, say an M.D. or D.O. that's a generalist, their familiarity with eye disease is minimal. I mean, it's the -- I can tell you from working in the hospitals, you know, the smartest thing would be for someone in charge to say, you know what? This is, like, weird. This couldn't be just glaucoma with those kind of field defects. Let's -- let's have this seen by neurology at least outside.
>
> Q: Would that decision be made by somebody familiar with optometry? Should that have been an optometry decision?
>
> Dr. Leftkowitz: Well, you know, an optometrist looking at those fields should right away call, you know, neurology or neurosurgery at St. Louis U or whatever hospital they're contracted with. That would have been what should have happened immediately. I mean, again, the vision being so poor, you know, maybe a retina specialist could have looked first, but he would have referred the patient to a neurosurgeon.
>
> Q: Okay.
>
> Dr. Leftkowitz: But there's just the -- you know, an alarmingly bothersome level of ignorance here with the way it was handled by *Dr. Lochhead*.

(Doc. 133-4, p. 5) (emphasis added). Even if the Court were to *somehow* construe the opinion of a Dr. Lochhead—an optometrist—against Dr. Trost, "it reflects a difference of opinion among medical professionals, which cannot support a deliberate indifference claim." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 243 (7th Cir. 2021).

Paige alleges "[h]ad Defendants authorized an MRI for Plaintiff after he initially complained that the conservative treatment was not effective in 2012, the tumor on Plaintiff's pituitary gland would have been discovered and removed in time to save Plaintiff's vision" (Doc. 98, p. 5). Besides the discussion above, Paige's expert agreed that he could not quantify how different the outcome would have been if Paige had an earlier surgery. (Doc. 133-4, p. 3). When asked whether radiation would have been necessary at an earlier date, Paige's expert conceded "[t]hat's out of my wheelhouse, unfortunately." (*Id.*). On these facts, the Court cannot say that Dr. Trost was deliberately indifferent to Paige's medical needs, and summary judgment must be granted in favor of Dr. Trost on Count XI.

### III.   Count XIII – *Monell* Liability Against Defendant Wexford

Paige alleges that Wexford violated Paige's constitutional rights through "official policy and/or an unofficial custom of providing conservative treatment in an effort to cut costs even where the treatment has proven to be ineffective." (Doc. 98, pp. 8-9); *see Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690–91 (1978); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d. 954, 966-67 (7th Cir. 2019) (applying *Monell* to private corporations, like Wexford, which act under the color of state law). To move ahead on this part of the case, Paige "must prove that Wexford's official policy, or an established custom, or a decision by a final decision maker, caused the alleged constitutional violation." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 568 (7th Cir. 2021). "Often the lack of liability on the part of the subordinate actors means that there is nothing unlawful for which the entity might be liable, but that is not always the case." *Id.* "[I]f

institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017).

Here, Paige is bringing a "cost over care" theory premised on the notion that Wexford places profit over the care of its patients, resulting in the failure to provide Paige with constitutionally adequate health care. Paige points to the following section of the contract between IDOC and Wexford:

> 2.2.3.10 Follow-up to previous surgery or procedure: If an offender requires hospitalization or other specialty care in follow-up to a previous surgery or procedure, [Wexford] shall refer the offender to the provider or facility that originally provided the services, when possible. With the exception of state-owned transportation when available and security costs, [Wexford] shall be responsible for all costs associated with specialty care. If the costs are Hospital Services, the costs will accrue to the Annual Hospital Threshold.

(Doc. 143, pp. 12-13). Paige also provides the following provision of the Provider Handbook:

> VI. Cost Considerations
>
> A criticism frequently directed toward private managed care programs like Wexford Health is that services are withheld to improve profits. Similar criticism has been directed at the medical industry in general, implying that cost – money – should never be a consideration in regards to providing medical care. Cost has always been a consideration in treatment, and with progressive government "Health Care Reform" will become a far greater factor than it has ever been under the "control of the health profession."
>
> Consideration in deciding treatment is given to whether or not the Department of Corrections has the responsibility to provide a treatment. The mere existence of a condition DOES NOT CONSTITUTE A RESPONSIBILITY for repair!
>
> When considering alternative treatment approaches, cost becomes a consideration. Even then, it is not THE determinant, but only ONE of

> several possible variables considered. Cost, per se, usually becomes the last variable considered, belying its importance.
>
> Meanwhile, the role of the medical staff is to: 1) provide medical care to individual patients, and 2) seek the best quality we can afford and spread our health care budget to effectively cover as many services as possible. Cost has been and must continue to be a consideration. The "cost of service" remains an important factor to be shouldered by each health care professional. Being fiscally responsible builds a broader range of treatment alternatives.

(*Id.*).

"This theory has appeal." *Barrow v. Wexford Health Sources, Inc.*, 2017 WL 784562, at *10 (S.D. Ill. Mar. 1, 2017). But Paige "need[s] evidence not only that Wexford prioritizes cost savings, but that he was injured by treatment decisions that were cost-driven." *Barrow v. Wexford Health Sources, Inc.*, 816 F. App'x 1, 5 (7th Cir. 2020). Here, Paige has "not pointed to evidence sufficient to allow a trier of fact to find 'systemic and gross deficiencies' in Wexford's procedures or lack thereof." *Quinn*, 8 F.4th at 568 (citation omitted). "[T]here can be little doubt that a practice or custom theory will be more persuasive if a plaintiff can show that the defendant government or company treated other, similarly situated patients in similar unconstitutional ways." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 655 (7th Cir. 2021). Paige has not presented evidence of similarly situated inmates.

At the very least, Paige "need[s] [ ] evidence that there is a true municipal [or corporate] policy at issue, not a *random event*." *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (quotations omitted) (emphasis added). The problem is Paige merely believes that Wexford placed profit over his care because it took so long for him to get the MRI. (Doc. 133-1, p. 21). Nobody ever told Paige that an MRI was too expensive. (*Id.*).

Construing the evidence in a light most favorable to Paige, the delay in Paige's MRI appears to be a *random event*—not evidence of a true corporate policy. Once a *new optometrist* evaluated Paige, the new optometrist not only noted the bilateral temporal hemianopsia with severely reduced vision in the left eye, but also recommended "neuro or neuro-ophthalmology ASAP." (Doc. 134, p. 139). There is no dispute that Paige received adequate and appropriate medical care after the new optometrist's evaluation. (Doc. 143, p. 9). The fact that Defendants did not delay or forgo Paige's later treatment undercuts the notion that Wexford's alleged cost-cutting policy was the reason for the delay in the MRI. Instead, the evidence shows the delay was caused by Dr. Lochhead's alleged failure to discover the bilateral temporal hemianopsia. Accordingly, summary judgment must be granted in favor of Wexford on Count XIII.

## Conclusion

For the reasons stated above, Defendants' Motions for Summary Judgment (Docs. 132 & 135) are **GRANTED**. Plaintiff Paige shall recover nothing. The Clerk of Court shall close this case and enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: February 14, 2022

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**